**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| DOMAIN NAME CLEARING COMPANY, LLC, <br><br> *Plaintiff-Appellant,* <br><br> v. <br><br> F.C.F. INCORPORATED, <br> *Defendant-Appellee.* | No. 00-2509 |

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, Chief District Judge.
(CA-00-1305)

Argued: June 5, 2001

Decided: July 12, 2001

Before WILKINSON, Chief Judge, NIEMEYER, Circuit Judge,
and Irene M. KEELEY, Chief United States District Judge
for the Northern District of West Virginia,
sitting by designation.

Affirmed by unpublished per curiam opinion.

## COUNSEL

**ARGUED:** Jerry M. Phillips, PHILLIPS, BECKWITH, HALL &
CHASE, Fairfax, Virginia; Chris M. Truax, San Diego, California, for
Appellant. John Foster Anderson, RICHARDS, MCGETTIGAN,
REILLY & WEST, Alexandria, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

We must decide here whether the Domain Name Clearing Company violated the 1999 Anticybersquatting Consumer Protection Act by registering the domain name Clarins.com. Because the district court did not err in holding that the company violated the Act, we affirm.

I.

On March 16, 1997, Domain Name Clearing Company, LLC (DNCC) registered the domain name Clarins.com. "Clarins" is a fictional name developed in 1954 by Clarins S.A. to identify a particular product line. F.C.F. Inc. now holds the license for the Clarins trademark. When F.C.F. discovered that DNCC had registered Clarins.com, it requested DNCC to transfer the Clarins.com domain name to F.C.F. F.C.F. received no response. F.C.F. subsequently offered DNCC $1500 in return for the transfer.

On March 24, 1998, DNCC filed an action against F.C.F. in California federal court seeking a declaration that its ownership of the Clarins.com domain name did not infringe upon F.C.F.'s Clarins trademark rights. One month later, DNCC sent F.C.F. a letter requesting a payment of the amount "it would cost to run a full-page advertisement in one of the high-fashion magazines, such as Cosmopolitan or Vogue, in which, it appears, your client advertises." F.C.F. refused to pay this amount, estimated at approximately $60,000.

After the California district court dismissed DNCC's action on jurisdictional grounds and the subsequent appeal to the Ninth Circuit was dismissed at DNCC's request, F.C.F. commenced an administrative arbitration proceeding. After a hearing, the panel ordered DNCC to transfer Clarins.com to F.C.F. on April 5, 2000. On April 21, 2000,

DNCC filed a Bill of Complaint against F.C.F. in Virginia state court. In the complaint, DNCC challenged the administrative decision and sought to prevent the transfer of Clarins.com. F.C.F. removed the action to federal district court on August 1, 2000.[1] After removal, F.C.F. moved for partial summary judgment based on its counterclaim that the registration of Clarins.com was a violation, *inter alia*, of the Anticybersquatting Consumer Protection Act (ACPA). 15 U.S.C. § 1125(d). Finding DNCC violated the ACPA, the district court granted summary judgment to F.C.F. DNCC now appeals.

## II.

The ACPA was enacted in 1999 to combat the practice of cyber-squatting. *See Virtual Works, Inc. v. Volkswagen of America*, 238 F.3d 264, 267 (4th Cir. 2001). A violation of the ACPA occurs when someone "registers, traffics in, or uses a domain name that...is identical or confusingly similar" to a "famous" or "distinctive" mark and "has a bad faith intent to profit from that mark." 15 U.S.C. § 1125(d)(1)(A). The statute lists nine non-exclusive factors to determine bad faith.[2] The determination of bad faith depends on the facts

---

[1] DNCC argues that the federal courts lack subject matter jurisdiction because the amount in controversy is less than $75,000 as required by 28 U.S.C. § 1332. The district court determined that the domain name Clarins.com was the object of the litigation and worth more than $75,000. We find no error in this ruling.

[2] The nine factors are as follows:

(B)(i)In determining whether a person has a bad faith intent . . . a court may consider factors such as, but not limited to

(I) the trademark or other intellectual property rights of the person, if any, in the domain name;

(II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

(III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

(IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;

and circumstances of each case. *See Virtual Works*, 238 F.3d at 268; *Sporty's Farm, L.L.C. v. Sportman's Market, Inc.*, 202 F.3d 489, 499 (2d Cir. 2000).

The Act also contains a safe harbor which states that bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). The ACPA provides that, for violations of the act prior to 1999, the sole remedy is to transfer the domain name back to its rightful owner. Anticybersquatting Consumer Protection Act, Pub. L. No. 106-113, § 3010, 113 Stat. 1501A-552 (codified at 15 U.S.C. § 1117 note).

---

> (V) the person's intent to divert consumers from the mark owner's online location to a site . . . that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark . . .;
>
> (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used . . . the domain name in the bona fide offering of any goods or services . . .;
>
> (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name . . .;
>
> (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others . . .; and
>
> (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous . . . .

15 U.S.C. § 1125(d)(1)(B)(i).

### III.

### A.

We first inquire whether DNCC acted with bad faith intent when it registered Clarins.com. There is substantial evidence that it did. First, DNCC did not own any trademark or intellectual property rights to the Clarins name; rather F.C.F. owns the Clarins trademark license. In fact, Clarins was a fictional name created by Clarins S.A. exclusively to identify its cosmetics line. Second, Clarins is not commonly used to identify DNCC. Nor did DNCC ever develop a website at Clarins.com or use the Clarins name in connection with the sale of goods or services. DNCC had nothing whatsoever to do with selling the Clarins product line. Indeed, there is no evidence that DNCC had any use planned for Clarins.com. Also DNCC attempted to sell Clarins.com for "the amount it would cost to run a full-page advertisement in one of the high-fashion magazines." This demand, estimated at $60,000, was reduced to $30,000 in subsequent negotiations.[3]

Finally, the evidence demonstrated that DNCC has registered more than seventy different domain names and has a primary business purpose of registering domain names. For instance, DNCC has registered belgianchocolate.com, britishmuseum.com, chianti.com, and towerof-london.com among others. The fact that these domain names may not have infringed on other trademarks does not make DNCC's registration of them irrelevant. In fact, it shows an intent on the part of DNCC to register a variety of domain names, but not to use them. This is a key factor in the bad faith determination.

In response to the evidence demonstrating its bad faith, DNCC attempts to take refuge in ACPA's safe harbor. 15 U.S.C. § 1125(d)(1)(B)(ii) (providing a safe harbor for persons who reasonably believe that "the use of the domain name is a fair use or other-

---

[3]DNCC argues that the evidence utilized by the district court to determine if DNCC attempted to sell the domain name Clarins.com was inadmissible under Rule 408 of the Federal Rule of Evidence because the documents were part of settlement negotiations. This evidence speaks directly to the bad faith determination. And DNCC admitted evidence of alleged settlement negotiations in the first place. In all events, we find no abuse of discretion in the admission of the disputed evidence.

wise lawful"). DNCC relies heavily on the fact that when it registered Clarins.com and many of the other domain names in 1997, the Internet was in its infancy and Congress had not yet passed the ACPA. With respect to the Clarins name, DNCC also argues it was not aware that Clarins was a registered trademark. But it did become aware of the trademark in 1997 and yet, it subsequently renewed its registration of Clarins.com. DNCC also did not offer any evidence of why it selected that name or what it intended to do with Clarins.com or any of its other domain names. The safe harbor will not be construed "so broadly as to undermine the rest of the statute." *Virtual Works*, 238 F.3d at 270. The evidence clearly shows that DNCC made a business out of registering domain names in order to sell them and "a defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the Act's safe harbor provision." *Virtual Works*, 238 F.3d at 270.

A court may look at the totality of the circumstances in making bad faith determinations. *See* 15 U.S.C. § 1125(d)(1)(B)(i); *Virtual Works*, 238 F.3d at 270. Viewed together, the evidence makes clear DNCC acted with bad faith when it registered Clarins.com, failed to use it, and then attempted to sell it for profit to the trademark holder. DNCC's actions are just the sort Congress acted to prevent with the passage of the ACPA.

B.

The ACPA also requires that the registered name be "identical or confusingly similar" to a "famous" or "distinctive" mark. 15 U.S.C. § 1125(d)(1)(A). The domain name Clarins.com is identical to the Clarins mark. To determine whether a mark is distinctive and famous, courts look to the duration and extent of the use of the mark, the advertising and promotion of the mark, and the degree of public recognition of the mark. 15 U.S.C. § 1125(c)(1). The Clarins name is fictional and has been used since 1954 to identify a cosmetics line. Clarins S.A., under the Clarins trademark, has marketed Clarins products in the United States for almost 20 years, spending over $4.5 million on advertising and generating over $100 million per year in sales in this country. F.C.F. obtained a United States Trademark registration for Clarins in 1990 which was renewed in 2000. The name Clarins is distinctive and famous as required by the statute.

## C.

DNCC also argues that there was evidence of a prior settlement agreement in which F.C.F. agreed to pay $30,000 for Clarins.com. DNCC claims that this makes F.C.F.'s counterclaims irrelevant since the dispute was settled and the domain name was to be transferred pursuant to the agreement. However, even viewing the evidence in the light most favorable to DNCC, there is no evidence of a settlement agreement signed by all parties. F.C.F., throughout the negotiations, insisted that any settlement be in writing and signed by all parties. As the district court noted, "[a]n attached exhibit of a draft of an alleged settlement agreement signed by the attorney of one party is not evidence of a settlement agreement entered into between the parties." DNCC simply failed to offer sufficient evidence to create a genuine factual dispute on this point.

## IV.

The record is replete with evidence that DNCC had a bad faith intent to profit from another's mark in violation of the ACPA. The district court did not err in ordering DNCC to transfer Clarins.com to F.C.F., and we hereby affirm its judgment.

*AFFIRMED*